Preston *vs.* Evans.

Finding no error in the rulings of the Court below, we must affirm the judgment.

*Judgment affirmed.*

(Decided 29th June, 1881.)

---

## Eliza Preston *vs.* David Evans.

*Construction of a Devise, without words of Inheritance, made prior to the Act of 1825, ch. 119—Effect of the deed of a Féme Covert and her husband, made in 1821, upon her After acquired interests in the land conveyed—Acts of 1715, ch. 47, and 1766, ch. 14—Covenant of general Warranty made by a Féme Covert—Estoppel—Limitations and adverse possession—"Legal title" a question of Law, not of Fact— Evidence—Admissibility of Certified copies of Deeds, in trials in the Court in whose office they are recorded.*

W. B., who died in the year 1821, devised a farm to his daughter, R. M., for life, "and at her death, I leave it to her son, J. M." HELD:

1st. That this will having been made prior to the Act of 1825, ch. 119, the principle of construction then in force, and which had been established by a. long line of thoroughly considered cases, restricted the devise to J. M., to an estate for his life only ; and the reversion in fee descended to the heirs-at-law of the testator.

2nd. That R. M. being one of seven heirs of the testator, was entitled as devisee to an estate for life in the land, and as heir-at-law to the one-seventh of the inheritance thereof, subject to the life estate devised to J. M., which could only commence in possession at the termination of the preceding life estate to the mother.

3rd. That subsequently, at the death of any, or either of the brothers or sisters of R. M. without issue, and without having disposed of his, or her reversionary interest in the land, R. M. became entitled as one of the heirs-at-law of such deceased brother or sister to her proportionate interest in the estate of the deceased.

Preston *vs.* Evans.

4th. That a deed made in December, 1821, by R. M. and her husband, and J. M., of all their estate, right and interest in said land *as heir or devisee* of said testator, or otherwise, was effective to grant and convey to the grantee all the right and estate in said land that belonged to, or was vested in the grantors at the time of its execution. It conveyed the life estates devised to R. M. and J. M. by the will of the testator; and also the fee simple in one-seventh part of the reversionary estate in the same land, which descended to R. M. as one of the heirs-at-law of the testator.

5th. That the said R. M. being at the date of the deed a *féme covert*, her covenant of general warranty therein contained, did not by estoppel preclude her, and those claiming under her, from claiming or making title to any *after acquired* interest or estate in the lands, whether by inheritance from her deceased brothers and sisters or otherwise.

6th. That the Legislature, by the Acts of 1715, ch. 47, and 1766, ch. 14, which at the time said deed was made, furnished the authority and directions for divesting and conveying the estates in land of *fémes covert*, clearly never intended to authorize a *féme covert* to convey what she did not own, and what was not at the time of making the deed the subject of conveyance; and to allow her to be barred of her future or after acquired estate by mere operation of her covenant of warranty, which was void by the common law, and not authorized by statute, would be in plain contravention of the policy and object of the whole legislation upon the subject of conveyances by *fémes covert*.

7th. That R. M. having died in 1863, and as until her death the plaintiff, (who was her daughter,) could have no right of entry into the land by virtue of any right or title derived from her mother; and, therefore, the defendant could not rely upon adverse possession, or the Statute of Limitations to defeat the plaintiff's right to recover.

A prayer is defective in submitting to the jury in an action of ejectment, to find whether the legal title to the land is in any other person than the plaintiff. That, upon facts to be found by the jury, is a question of law for the Court.

The fact that a deed is of record in the clerk's office of the Court where a case is tried, can make no manner of difference in regard to the admissibility of a certified copy. Such certified copy is made evidence in all the Courts of the State without any excep-

tion, (Code, Art. 37, secs. 37, 58,) and there is no reason whatever for holding that such certified copy can only be used when the record itself cannot be produced.

When the record is within reach and can be produced, it may be used instead of a certified copy from it, but it does not follow because that may be done, that a certified copy is rendered inadmissible.

APPEAL from the Circuit Court for Allegany County.

The case is stated in the opinion of the Court.

*First Exception* sufficiently stated in the opinion of the Court.

*Second, Third, Fourth* and *Fifth Exceptions*, not passed upon by the Court.

*Sixth Exception.*—The plaintiff offered six prayers, the third and sixth of which are omitted, as not having been passed upon by this Court; the others are as follows:

1. That if the jury shall believe from the evidence, that William Barnes died, seized and possessed of the land mentioned in the plaintiff's declaration, and by his last will and testament, offered in evidence in this cause, devised the same to his daughter, Ruth Metz, for life, and at her death, to her son, John Metz, and shall further believe that the said Ruth Metz, died in the year 1863, and that John Metz, died in the year 1857 or 1858, and that the plaintiff is the grand-daughter of the said William Barnes, then the plaintiff is entitled to recover in this suit, to the extent of her interest or estate therein, at the time of the bringing of this suit, which is one-seventh of one-half, or one-fourteenth.

2. That the defendant cannot make title to the land mentioned in the plaintiff's declaration, by possession thereof, if they find the facts as set forth in the plaintiff's first prayer.

4. That John Metz and Ruth Metz, took but a life estate in the land mentioned in the declaration, and that the plaintiff is entitled to recover, there being no evidence that the defendant, or any one else, has any other title than John Metz and Ruth Metz were capable of conveying.

5. That she is entitled to recover one-fourteenth of the rents and profits arising from the land mentioned in the plaintiff's declaration, for the time that she was entitled to possession thereof; provided they shall find that the title to the land in dispute is in the plaintiff.

And the defendant offered eleven prayers, of which the first seven are omitted, as not having been passed upon by this Court; the others are as follows:

8. That it is not necessary for the defendant to show a title in himself to the property sued for in this case, in order to defeat the plaintiff's recovery, but if the jury find the legal title, outstanding in any person other than the plaintiff, their verdict must be for the defendant.

9. That the will of William Barnes, Sr., offered in evidence by the plaintiff, is insufficient in law to pass any title from William Barnes, Sr., to Ruth and John Metz, and the plaintiff has offered no sufficient evidence of title in her, to the property sued for, other than as an heir-at-law of her grandfather, William Barnes, Sr.

10. That if the jury find, under the instructions of the Court, that the plaintiff has made no title to the land sued for, except as an heir-at-law of her grandfather, William Barnes, Sr., and if they are instructed by the Court, that the will of said Barnes is insufficient in law to pass any title to the land sued for, to Ruth and John Metz, and that William Barnes left several children, of whom the plaintiff's mother, Ruth Metz, was one, and that Barnes died in the year 1821, and Ruth Metz was, at the time of his death, the wife of Isaac Metz, and that Isaac Metz died about the year 1853, and Ruth Metz died about the year 1863, after surviving her husband several years;

and if they further find, that the defendant, and those under whom he claims, have been in exclusive and uninterrupted adverse possession of the land in controversy, for more than twenty years before the bringing of this suit, then the plaintiff cannot recover in this action.

11. That if the jury find, that John Metz and Ruth Metz, executed the deed to Morrison, offered in evidence; and if they believe that William Barnes, Sr., died in 1821, and that he left seven children, of whom said Ruth Metz, was one, and that Ruth Metz died in 1863, and that prior to her death, all her brothers and sister, except one, died without issue, and that the remaining one of said brothers, viz., John Barnes, left issue now living, and if they find, that William Barnes, Sr., executed the will offered in evidence by the plaintiff, and if they find (under instructions from the Court,) that John Metz, took only a life estate under said will, then they are instructed that the deed from Ruth Metz, and her husband, to Morrison, conveyed to him not only her life estate, but all the estate which afterwards vested in her in remainder, as an heir-at-law of her father, and the plaintiff is estopped by said deed, to set up any title in this case as an heir-at-law of her grandfather, which she may claim through (or by representation from,) her mother, Ruth Metz.

The Court (PEARRE, J.) granted the plaintiff's third prayer, and rejected all her others, and instructed the jury verbally, that John Metz took only a life estate in the land in controversy, under the will of William Barnes, Sr., and granted the defendant's fourth, fifth, eighth and eleventh prayers, and rejected all his others.

The plaintiff excepted, and the verdict and judgment being rendered against her, appealed.

The cause was argued before BARTOL, C. J., GRASON, ALVEY, ROBINSON, IRVING, RITCHIE, and MAGRUDER, J.

*James E. Ellegood,* for the appellant.

The devise to John contains no words of limitation, or words of equivalent force. It was executed in 1821, prior to the Act of 1825, ch. 119, declaring words of perpetuity unnecessary. Doubtless this Act was passed in accordance with the suggestion of BUCHANAN, C. J., in *Beall vs. Holmes,* and is almost equivalent to a legislative confirmation of that decision. 6 *H. & J.,* 215, 226, 227; *Newton vs. Griffith,* 1 *H. & G.,* 111; *Dougherty vs. Monett,* 5 *G. & J.,* 459.

But is "the plaintiff estopped by the deed of Ruth Metz," to set up title to any of the land claimed?

Holding to the theory that John had but a life estate, what estate had Ruth at the date of the deed in 1821? She had a life estate under the will to all of the Rhodes' plantation, the *reversion* being in the heirs of Wm. Barnes, the testator, of whom there were seven. Ruth being one of them, could at that time only have had one-seventh, and that like all others, *expectant* on the determination of the life estate of John; the difference being that hers was expectant on *one,* and the others on *two* life estates.

There was no merger in Ruth of the two estates *pro tanto,* for they both came to her at the same moment. *Crisfield vs. Storr,* 36 *Md.,* 144.

The technical common law estoppel by which future estates were held to actually pass in cases of feoffment as against the feoffer, has not escaped severe criticism, but since the statute *quia emptores,* a feoffment of the ancester no longer estops the heir, from setting up title to subsequent estates. But the deed in question is a simple deed of bargain and sale, and contains none of the essentials of a feoffment.

Deeds of bargain and sale have never been held to pass future estates, and, therefore, if the plaintiff be estopped, it is because of the covenant of warranty in the deed;

but covenants do not transfer the subsequent estate, they only operate as a personal rebutter to " recovery in opposition to its terms." 2 *Smith's Lead. Cases*, 551–560, *Amer. notes, to Doe vs. Oliver ; Rawle on Covenants*, 327–336, *et seq.*, 559 ; *Doe vs. Scarborough*, 3 *B. & E.*, 2 ; *Right vs. Buchnell*, 2 *B. & E.*, 278 ; *Blanchard vs. Brook*, 12 *Pick.*, 47 ; *Comstock vs. Smith*, 13 *Pick.*, 116.

The case of *Blanchard vs. Brook*, is in many respects similar to this. Estoppels are not favored in law or equity, and must be certain. *Pelletrean vs. Jackson*, 11 *Wend.*, 117 ; 4 *Kent's Com.*, 261, *mar., note b ; Chew vs. Barnett*, 11 *S. & R.*, 389.

There are two conditions on which covenants of warranty have been permitted to act as an estoppel on subsequent estates. Those where the grantor had *no* estate at the time of the deed, and those where it manifestly appears from the deed that the grantor intended to pass a *future* as well as the present estate. Among the former are *Somes vs. Skinner*, 3 *Pick.*, 52, and *White vs. Patten*, 24 *Pick.*, 324, and others cited in *Hare & Wallace's notes ; Doe vs. Oliver*, 2 *Smith's Lead. Cases.*

Among those there cited as supporting the latter view is *Fairbanks vs. Williamson*, 7 *Greenl.*, 96, but which it seems was overruled in *Pike vs. Galvin*, 29 *Maine.*

The grant in question is obviously not in the first class of cases, and it does not fall within the second.

The deed makes a particular recital of the estate intended to be conveyed, by setting out the clause of Wm. Barnes' will, and when the grantors bargain and sell " all the *right, title and interest* which they *have* to *any* lands, as heir *or* devisee of Wm. Barnes," they only intended to convey such right, title and interest as they then *had* to the said " tracts or parcels of land, so as aforesaid described, with àll the hereditaments and appurtenances thereunto belonging, and all the right, title and interest in and to the *same*. To have and to hold," &c. They do not speak

of " any " *other* land, therefore, the words, right, title and interest, can only relate to the land so " as aforesaid described." They use no words of futurity, but speak only of such as they " have." Nor do they make any averment of quantity or quality of the estate conveyed, which this plaintiff is seeking to contradict.

Now the eleventh prayer of defendant is, that Ruth Metz conveyed " not only her life estate, but all the estate which *afterwards vested* in her in remainder ; and that the plaintiff is estopped by the *said deed.*"

The words " heir *or* devisee " are used interchangeably, as though they were meant to be used in the same sense. Ruth took a life estate as devisee. Now assuming that her *expectant reversion* in one-seventh of the land was such as could have passed by the deed, she could not have conveyed nor *intended* to have conveyed any greater estate than she then *had.* Five of the other heirs of Wm. Barnes having died without issue, long after the deed, she had not at that time anything more than a bare *possibility* of succeeding to their estates.

It matters not whether the one-half of the five-sevenths descended to her as heir of her father, or as heir of her brothers and sisters, she did not convey that one-half.

" All warranties which shall be made by any tenant for life, are void." 4 *Ann., ch.* 16, *sec.* 21, *Alex's Brit. Statutes,* 662 ; *Crisfield vs. Storr,* 36 *Md.,* 146 ; *Rawle on Covenants,* 23, 24, *ch.* 1.

Is a *féme covert* barred or estopped by her covenant ? Formerly, it seems the authorities were not uniform. The leading case of *Fowler vs. Shearer,* 7 *Mass.,* 15, placed her estoppel on the ground of immemorial usage in that State, and that otherwise it would unsettle many estates. The Chief Justice held it to be a kind of New England common law doctrine, but this case has been overruled in *Lowell as. Darniels,* 2 *Gray,* 161.

A *féme covert* was held not to be estopped in the following cases: *Nicholson vs. Hemsley,* 3 *H. & McH.,* 409 ;

Preston *vs.* Evans.

*Jackson vs. Vanderheyden,* 17 *Johns.,* 167 ; *Carpenter vs. Shermirhorn,* 2 *Bar. Ch.,* 314; *Martin vs. Dwelly,* 6 *Wend.,* 14 ; *Wadleigh vs. Glines,* 6 *N. Hamp.,* 18 ; *Doe vs. Demorest,* 1 *Zab.,* 541; *Strawn vs. Strawn,* 50 *Ill.,* 33; *Bigelow on Estoppel,* 276, *note* 1.

The author in the above note, referring to *Hill vs. West,* 8 *Ohio,* and *Massie vs. Sebastian,* 4 *Bibb,* 433, says : The different doctrine there held is untenable. This must be so from the very reason of the rule, which is to prevent circuity of action. 2 *Kent's Com.,* 168, *marg.;* 2 *Smith's Ldg. Cases,* 514, *Eng. notes.*

The case of *Morris vs. Harris,* 9 *Gill,* 19, did not depend on the force of the covenant. The *féme covert* having joined in a deed of partition, duly executed and acknowledged, she was barred by the deed itself.

*Benjamin A. Richmond,* and *William Brace,* for the appellee.

Although a married woman in this country was not generally (unless by statute) liable to an action on her personal covenants, yet, a distinction was early taken by the Courts between the effect of such a covenant, when set up against her heir by way of estoppel, and when she was attempted to be made personally liable thereon. In Massachusetts, as early as 1812, this distinction was clearly drawn. *Colcord vs. Swan,* 7 *Mass.,* 291.

It is a principle founded in reason as well as justice, she is not to be held liable personally upon her covenants, because the statutes authorizing her to convey her lands, do not also authorize her to contract, so as to make herself liable in an action. The covenant of warranty is not ordinarily a necessary part of the deed, to effect the transmission of title. When used as the basis of an action it is generally collateral to the main purposes of the deed. When, however, the covenant becomes a necessary part of the deed to effect the transmission of title, she is bound

by it for that purpose and for that purpose only. Because in that case she is presumed to be authorized by the statute to do everything which was necessary to effect the intent and purposes of the deed, viz., to vest in her grantee an indefeasible title, to the lands, against her and her heirs forever.

Her covenant may become the passive conduct of title, although it could not be made to respond in damages for a breach of it. This principle has been recognized and held in the following cases, and applied to cases of after acquired estates, as well as to cases where the grantor possessed a larger estate than she supposed she was conveying at the time. *Colcord vs. Swan,* 7 *Mass.,* 291; *Hill vs. West,* 8 *Ohio,* 222; *Nash vs. Spofford,.* 10 *Metcalf,* 192; *Cashford vs. Pearson,* 7 *Allen,* 505 ; *Brown vs. Coon,* 36 *Illinois,* 243, 246; *Doane vs. Willcutt,* 5 *Gray,* 328, 332.

Apart from decisions of other States, however, the question seems to have been directly settled in this way in this Court. *Morris vs. Harris,* 9 *Gill,* 25.

The Court here proceeds on the ground that the privy examination of the wife under the Act of 1766, ch. 14, renders her free of the influence and control of her husband, and she is then " presumed to act as *féme sole*— such conveyance operates as an estoppel against her—as effectual as if she were *sui juris.*" " Her *covenant* operates by way of estoppel to debar her from assuming a right in derogation of her grant."

The terms of our statute, under which the deed now in question was made, (Act of 1766, ch. 14,) seems to have largely affected the Court's decision in that case, and certainly the terms of that Act are broad enough to confer upon a *féme covert* every power in the making of a deed necessary to vest a perfect title in her grantee forever, so far as she and her heirs were concerned. *Act of* 1766, *ch.* 14.

As reflecting upon and sustaining this principle, we also refer to *Abrams vs. Sheehan,* 40 *Md.,* 446 ; *Webster's Lessee vs. Hall,* 2 *H. & McHy.,* 19.

Surely, if the principles of justice involved in the doctrine of estoppel needed an exemplification, it is presented by the facts of this case.

Here the appellee, and those under whom he claims, have been in undisputed possession of the premises now sued for, for nearly sixty years, and have improved it to eight or ten times its original value. Unless, therefore, there is some stern and inflexible rule of the law to the contrary, (which we have shown does not exist in most of the States, and certainly not in Maryland,) the appellant ought to be held estopped by the solemn act of her mother, in the execution of the deed of 1821.

ALVEY, J., delivered the opinion of the Court.

This was an action of ejectment instituted by the present appellant, on the 8th day of December, 1879, against the appellee, to recover certain lands in Garrett County. The case was removed to the Circuit Court for Allegany County, and upon the trial there certain bills of exceptions were taken by the appellant, upon which the questions arise that this Court is now called upon to decide.

As the exceptions to the rulings of the Court below upon the prayers offered by the respective parties present the main questions of the case, we shall first consider those ; leaving the questions upon the admissibility of evidence to be disposed of in conclusion.

It appears that William Barnes, Sen., of Allegany County, died in the year 1821, leaving surviving him seven children, sons and daughters, of whom Ruth Metz, wife of Isaac Metz, was one. By his last will and testament, dated the 30th of January, 1821, and admitted to probate on the 8th day of May, 1821, he devised a certain farm or plantation, purchased of John Rhodes, to his daughter Ruth for life, " and *at her death*," to use the terms of the devise, " I leave it to her son, John Metz," without saying anything more. There is no other specific

devise in respect to this particular land, nor is there any residuary clause in the will.

Ruth Metz survived her husband, and died in the year 1863, but whether intestate or not, the record does not inform us. She had nine children, of whom the appellant is one; and all of whom, except the appellant and John, according to the agreed statement of facts, have died leaving children; but, according to the proof of the appellant, two of the children died without issue. John, the devisee under his grand-father's will, was never married, and died in 1857 or 1858. Whether any of the children except the appellant, survived the mother, does not appear.

William Barnes, Sen., left seven children, all of whom, except Ruth Metz and John Barnes, died some time between the years 1830 and 1850, without issue; but whether intestate or not does not appear. John Barnes is dead, and left children living.

The first question presented on the prayers, (the fourth on the part of the appellant, which was refused, and the eleventh on the part of the appellee, which was granted,) is as to the construction of the will of William Barnes, Sen., or rather the devise therein to Ruth and John Metz of the land now in controversy.

There can be no question as to the estate taken by Ruth Metz under her father's will. By express terms, the estate devised to her was for her life only. But as to the devise to her son John, made in general terms, without words of inheritance or limitation of any kind, it is supposed that an estate in fee was intended to be given. And this contention derives considerable force from the preceding express devise for life to the mother. But this will having been made prior to the Act of 1825, ch. 119, the principle of construction then in force, and which had been established by a long line of thoroughly considered cases, restricted the devise to John Metz to an estate for his life

only ; there being nothing in the context of the devise sufficient to enlarge the estate given to a fee simple. For this well settled rule of construction it is not necessary to do more than refer to the leading case in this State of *Beall vs. Holmes*, 6 *H. & J.*, 205, where all the authorities, down to the time of the decision of that case, were elaborately reviewed. We may, however, refer, in support of the same principle of construction, to the 3rd vol. of the recent edition (*the 5th Am.*) of *Jarman on Wills*, pages 20 and 21, where all the authorities upon the subject will be found carefully collated, and the result of them stated.

As therefore neither Ruth Metz nor John, her son, took more than life estates in the land devised, it follows that the reversion in fee descended to the heirs-at-law of the testator. And there being seven heirs entitled, the one-seventh of this reversion in fee descended to and became vested in Ruth Metz, one of the children. She was therefore entitled as devisee to an estate for life in the land, and as heir-at-law to the one-seventh of the inheritance thereof, subject to the life estate devised to John Metz, which could only commence in possession at the termination of the preceding life estate to the mother. Subsequently, upon the death of any or either of the brothers or sisters of Ruth, without issue, and without having disposed of his or her reversionary interest in the land, Ruth became entitled, as one of the heirs-at-law of such deceased brother or sister, to her proportionate interest in the estate of the deceased.

Such being the state of the title to the land sued for, as shown on the part of the appellant, the appellee then, for the purpose of showing title out of the appellant, and of showing it to be vested in those under whom he claimed, offered in evidence a certified copy of a deed from Isaac Metz and Ruth his wife, and John Metz, to James Morrison, dated the 4th day of December, 1821, for the same land devised to Ruth and John Metz, and for which this action is brought.

Preston *vs.* Evans.

This deed recites the devise to Ruth and John Metz, and that the grantors had agreed to sell to the grantee, "all the estate, right, title, and interest, which they, or either of them, had to any lands in Allegany County, *as heir or devisee* of William Barnes, Sen., deceased;" and in the premises or granting part of the deed, the grantors did "grant, bargain, sell, alien, release, enfeoff and confirm, unto James Morrison, his heirs and assigns, the said tracts and parcels of land, &c., and all the right, title and interest which they, or either of them, had to any lands in Allegany County, *as heir or devisee* of William Barnes, Sen., deceased, &c.; and all the estate, right, title and interest of them, the said Isaac Metz and Ruth, his wife, and the said John Metz, or either of them, of, in, and to the same." And in the deed there is a covenant of general warranty, whereby each of the parties grantors, "for themselves, their, and each of their heirs," &c., did covenant, promise and agree, to and with the grantee, his heirs and assigns, that they, the grantors, and their heirs, the said lands by the deed granted, would "warrant and defend against all manner of persons claiming any right or title thereto, or any part thereof."

This deed was certainly effective to grant and convey to the grantee all the right and estate in the lands mentioned that belongs to or was vested in the grantors at the time of its execution. It conveyed the life estates devised to Ruth and John Metz by the will of William Barnes, deceased; and also the fee simple in one-seventh part of the reversionary estate in the same lands, which descended to Ruth as one of the heirs-at-law of William Barnes, deceased.

It is contended, however, that the deed had a larger effect than simply to convey the existing estate or interest, whether vested or contingent, of the grantors in the lands; that, by force and operation of the covenant of general warranty, the grantors were estopped to assert title to the

lands conveyed, and that such estoppel precluded Ruth Metz, and those claiming under her, from claiming or making title to any *after acquired* interest or estate in the lands, whether by inheritance from her deceased brothers and sisters or otherwise. It is insisted that the covenant was effective to work such an estoppel as against Ruth Metz and those claiming under her, notwithstanding that at the time the deed was made she was a *féme covert*, and therefore not capable of making a valid or binding deed or covenant by the common law. And whether this contention be sustainable or not is the principal question in the case.

It is certainly true that by the common law, every deed or covenant executed by a *féme covert* is absolutely null and void. *Burton vs. Marshall*, 4 *Gill*, 487, 493. And independently of express statute, she could only convey her estate in lands by fine or by common recovery ; the former being in its nature a feoffment of record, and the latter, by means of the fictions employed, operated as a recovery of the lands by the judgment of a Court having competent jurisdiction of the parties and the subject-matter. *Lawrence vs. Heister*, 3 *H. & J.*, 371, 377.

The deed in this case having been made in 1821, the provisions of the Acts of 1715, ch. 47, and 1766, ch. 14, furnished the authority and directions for divesting and conveying the estates in land of *fémes covert*. By the 6th section of the Act of 1766, ch. 14, it was provided, that any *féme covert*, joining with her husband in any of the conveyances mentioned, and acknowledged according to the directions of the Act of 1715, ch. 47, where such *féme covert* "*hath the right, title or interest* in the lands or tenements, or any part thereof, by such conveyances intended to be given, granted, released," &c., should, by the execution, acknowledgment, and enrolment of such conveyance, be barred and foreclosed to all intents and purposes.

There was nothing in those Acts that either author-
ized or made covenants by *fémes covert* binding ; and no
covenants, either real or personal, were necessary to pass
the estate, or to debar the grantor from claiming the
property intended to be conveyed, as against her deed.
And from the very terms of the statute, it is manifest
that it never was the design of the Legislature that the
conveyances authorized to be made by *fémes covert* should
have any other operation than to transfer their right and
estate, of whatever nature held by them, in the lands
intended to be conveyed, at the time of the execution of
such conveyances.    The Legislature clearly never in-
tended to authorize a *féme covert* to convey what she did
not own, and what was not, at the time of making the
deed, the subject of conveyance; and to allow her to be
barred of her future or after acquired estate by mere
operation of her covenant of warranty, which was void by
the common law, and not authorized by statute, would be
in plain contravention of the policy and object of the
whole legislation upon the subject of conveyances by *fémes
covert*.

This question, more than three-quarters of a century
ago, underwent most thorough discussion, and, as we
take it, was definitely decided, in the case of *Nicholson's
Lessee vs. Hemsley*, 3 *H. & McH.*, 409.    That was an
action of ejectment brought by an heir in tail of the prem-
ises claimed, and the defendant, claiming under and
through the mother of the plaintiff, who was tenant in
tail, gave in evidence a deed of bargain and sale, made
by the mother and her husband, professing to convey the
land in controversy in fee simple, and which deed con-
tained a covenant of general warranty by the grantors or
bargainors, as against themselves respectively, and against
all other persons claiming, and especially against the heirs
of the *féme covert* grantor.    In connection with the cove-
nant of warranty, the defendant gave evidence that real

assets in fee simple, to the full value of the land in dispute, had descended from the mother, the tenant in tail, to the plaintiff, claiming as heir in tail. Such being the case, if the tenant in tail making the conveyance had not been a *féme covert*, there could have been no question but that both she and the heir in tail would have been barred and concluded by the covenant of warranty. Indeed, that was fully conceded in the argument. But it was because the covenant of warranty was not binding upon, and did not bar or estop the *féme covert* tenant in tail, that it was contended that the heir in tail, notwithstanding the inheritance of real assets in fee simple from the warrantor, was not bound or concluded. The question as to the effect of the covenant of warranty by the *féme covert*, was presented to the general Court directly and singly, in these terms : "The defendant, by his counsel, moved the Court to direct the jury, that if they should be of opinion that real assets in fee simple of the value aforesaid, descended from the said Esther to her daughters aforesaid, the said lessor was barred from her recovery in the ejectment aforesaid, by virtue of the warranty contained in the said deed." And upon full argument, Judges GOLDSBOROUGH and CHASE were divided in opinion, the former being of opinion that the covenant of warranty was competent to bind, and did bind, the *féme covert* and her heirs, while Judge CHASE was of opinion that the covenant did not bind or bar the *féme covert* or her heirs. Consequently, the instruction moved for was refused ; to which the defendant excepted, and the verdict and judgment being for the plaintiff, the defendant appealed.

The law as to the effect of the warranty in such case was as perfectly well settled as any principle of the common law could be. *Littleton, in his Tenures, L. 3, ch. 13, secs.* 711 and 712, says, "that as to him that demandeth fee simple by any of his ancestors, he shall be barred by

warrantie lineale which descendeth upon him, unless he
be restrained by some statute.   But hee that demandeth
fee tayle by writ of formedon in descender, shall not be
barred by lineale warrantie, *unless he hath assets, by dis-
cent in fee simple by the same ancestor that made the war-
rantie."* And *Coke* in his *Commentaries,* states the law
with equal explicitness.   *Co. Litt.,* 374 *b.*   If therefore
the heir in tail received real assets by descent from his
ancestor making the warranty, of the value of the land
claimed, he was equally barred and precluded as the heir
to the fee simple estate would be.   But, notwithstanding
this well established principle of law, the Court of Appeals,
after the most elaborate argument of distinguished coun-
sel, affirmed the judgment of the general Court, and
thereby the correctness of the refusal to grant the instruc-
tion prayed for by the defendant.   And the question hav-
ing been thus directly presented and decided, we can per-
ceive no good reason for disturbing it, and think it must
be regarded as settled.

The case of *Morris vs. Harris,* 9 *Gill,* 19; relied on by
the appellee, did not present the question of estoppel or
covenant of warranty by *féme covert,* to preclude her, or
those claiming under her, from making claim to an after
acquired title to the land embraced by the deed.   That
was the case of mutual covenants on partition of land
held in co-parcenary, one of the parties to the deed being
*féme covert.*   The covenant was simply that each party
should hold his or her part of the land assigned free from
the claim of the other.   The question that was there decided
arose upon an objection to the competency of one of the
parties as a witness; and it has but slight resemblance to
the question presented in this case.   There was no ques-
tion of after acquired title involved.

In looking to the decisions of other States, there seems
to be some conflict upon the question, whether the wife,
by joining with her husband in a deed conveying her

land, with covenant of general warranty, estops herself and those claiming under her, to claim an after acquired title. The decided preponderance of authority, however, is against holding such covenant to operate an estoppel as against the wife and those claiming under her. In some of the States the subject has been regulated by express statute. *Rawle on Cov.*, 401, and cases there cited; 1 *Bish. L. M. W.*, sec. 603; *Jackson vs. Vanderheyden*, 17 *John.*, 167; *Martin vs. Dwelly*, 6 *Wend.*, 14; *Nunnally vs. White*, 3 *Metc.*, (*Ky.*,) 593; *Childs vs. McChesney*, 20 *Iowa*, 431; *Hopper vs. Demorest*, 1 *Zabr.*, 525.

It follows from what we have said, that the proposition affirmed by the fourth prayer of the appellant, that Ruth Metz and John Metz 'took but life estates in the land devised to them by the will of William Barnes, Sen., was correct; but the prayer was properly rejected, because it withdrew from the jury the finding of facts essential to the right of the appellant to recover. But there was error in granting the eleventh prayer on the part of the appellee; as by that prayer the jury were instructed that the covenant of warranty worked an estoppel upon Ruth Metz, and those claiming under her, to claim any after acquired title in the land embraced by the deed of the 4th of December, 1821.

Ruth Metz died in 1863, and until her death the appellant could have no right of entry into the land, by virtue of any right or title derived from her mother; and therefore the appellee could not rely upon adverse possession or the Statute of Limitations to defeat the appellant's right to recover. The legal proposition, therefore, embodied in the appellant's second prayer was correct; but that prayer, like several of the others offered by the appellant, failed to present a proper collocation of the facts. Indeed, all the prayers on the part of the appellant were defective, either in form or substance, and there was,

therefore, no error committed in rejecting them. And while the granting of the eighth prayer of the appellee affords no ground of reversal, as there was no special exception taken to it under the rule, yet it was defective in submitting to the jury to find, whether the legal title to the land was in any other person than the appellant. That, upon facts to be found by the jury, was a question of law for the Court.

All the prayers offered for instruction on both sides with respect to the due and proper execution of the deed of the 4th of December, 1821, by John Metz, and the mode and sufficiency of proof thereof; as also the questions raised by the second, third, fourth and fifth bills of exception taken by the appellant, in respect to the admissibility of proof, become wholly immaterial to the right of the appellant to recover in this cause; her right to recover, whatever that right may be, not being derived through John Metz, but through Ruth Metz, the mother.

The only remaining question necessary to be determined on this appeal, is that presented by the first exception taken by the appellant, as to the admissibility in evidence of the certified copy of the deed of the 4th of December, 1821. And as to that question, we can entertain no doubt of the correctness of the ruling whereby the copy of the deed was admitted. The fact that the deed was of record in the clerk's office of the Court where the case was tried, can make no manner of difference, as seemed to be supposed by counsel of the appellant, in regard to the admissibility of the certified copy. Such certified copy is made evidence in all the Courts of the State, without any exception (Code, Art. 37, secs. 37, 58,) and there is no reason whatever for holding that such certified copy can only be used when the record itself cannot be produced. When the record is within reach and can be produced, it may be used instead of a certified copy from it, (*Morrill vs. Gelston*, 34 *Md.*, 413, 421,) but it does

not follow because that may be done, that a certified copy, is rendered inadmissible.

The judgment appealed from must be reversed, and the cause be remanded for a new trial.

*Judgment reversed, and*
*new trial ordered.*

(Decided 29th June, 1881.)